## PERRY *v.* WASHBURN.

UNDER the Revenue Act of 1861, it is the duty of the Tax Collector to execute and deliver to a person, paying his taxes in the coin therein designated, a receipt for the same, and the performance of this duty may be enforced by mandamus.

"United States notes," issued under the Act of Congress of February 25th, 1862, are not receivable for State and County taxes.

Taxes are not debts, within the meaning of that clause of the act which provides that the notes shall be "a legal tender in payment of all *debts,* public and private." Congress, by these terms, only intended such obligations for the payment of money as are founded upon contract.

A tax is a charge upon persons or property to raise money for public purposes. It is not founded upon contract, and does not establish the relation of debtor and creditor between the tax-payer and State.

The cases of *Moore* v. *Patch,* (12 Cal. 270) and *People* v. *Seymour,* (16 Id. 340) commented upon and explained.

APPEAL from the Twelfth Judicial District.

Application for mandamus. The petition of the relator shows that on the twenty-fourth day of July, 1862, defendant was Tax Collector of the city and county of San Francisco, and that the relator then owing city and county taxes assessed to him upon his property to the amount of two hundred and seventy dollars and forty-five cents, on that day tendered to defendant as Collector the said amount in United States notes issued under the Act of Congress of February 25th, 1862; that the said Collector refused to receive said notes, and refused, though requested, to give relator a receipt showing the payment of his taxes as it was his duty to do, and as was enjoined upon him by law. Wherefore a mandamus was prayed, commanding the defendant to receive the notes for the taxes, and execute the receipt. Defendant answered, admitting his official character, the correctness of the amount of taxes alleged to be due, the tender of the notes, and his refusal to receive them and to execute the receipt, and denying that it was his duty to receive the notes, or anything else than "legal coin of the United States, or foreign coin at the value fixed for such coin by the laws of the United States," in payment of the taxes due.

The case was submitted to the District Court upon the pleadings

and without argument, and judgment was rendered in favor of the defendant, refusing the mandamus prayed for; from which judgment the relator appeals to this Court.

*Taylor & Hastings,* for Appellant.

In behalf of the appellant, we shall endeavor to establish these propositions:

1st. That the Congress of the United States has the power, under the Constitution, to create paper money and make it a legal tender, and constitute it the currency of the nation.

2d. That Congress has exercised this power.

3d. That the Act of Congress making "United States notes" lawful money, and a legal tender in payment of all debts, public and private, within the United States, obliges every individual within the United States to receive such lawful money in payment of any debt, and enjoins the State, and every municipal corporation created by the State, to receive it in payment of its taxes.

4th. If there be anything in the Revenue laws of this State conflicting with this law of Congress, then the former are subordinate to the latter; and so far as they conflict, the State laws stand repealed.

I.    Congress has power to issue these notes, make them lawful money and a legal tender, and constitute them the currency of the nation.    Congress derives this power from the Constitution of the United States, Art. 1, sec. 8, subs. 5 and 17.

They recite that Congress shall have the power.    " 5. To coin money, regulate the value thereof and of foreign coin, and fix the standard of weights and measures."    " 17. To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by the Constitution in the Government of the United States, or any department or officer thereof."

The meaning of the words quoted from subdivision seventeen, their scope and aim, have been defined and settled by the Supreme Court of the United States.

At an early day the Bank of the United States was incorporated, with full power to issue bank bills and notes.    That such incorpora-

tion and action by Congress were constitutional, has been repeatedly affirmed by the Supreme Court of the United States, and upon this single subdivision seventeen of section eight. We refer at length to *McCulloch* v. *State of Maryland*, 4 Wheat. 316; *Osborne* v. *United States Bank*, 9 Id. 738, 859, 860; 1 Kent's Com. sec. 12, pp. 268, 269, *et seq.* and notes; Story on the Constitution, vol. 2, chap. 25, secs. 1259 to 1271; Sargent on the Constitution, chap. 28, 30; 5 Marsh. Wash. App. note 3; Hamilton on Bank, 1 Ham. works, 138–154; cited in Story on Constitution, note 4 to sec. 1267.

The reasoning found in these authorities, and others hereafter cited, which upholds the various Acts of Congress creating the United States Bank, and the consequences incident to its creation, establishes the constitutionality of the present act.

The argument against the Bank was, not that Congress had no power to create a paper currency and make it a legal tender in payment of debts, but that Congress had no power to create a corporation. It was admitted that "Treasury Orders" might issue, but objection was made to bank bills. (Story on Constitution, secs. 1260, 1261; Hamilton's argument for the Bank, *supra*.)

But the Court sustained the bank, on the idea "that the bank is an instrument which is necessary and proper for carrying into effect the power vested in the Government of the United States." (C. J. Marshall, in *Osborn* v. *United States Bank*, 9 Wheat. 860, *et seq.*) And upon the same idea, and falling entirely within it, the Court must sustain the legality of these treasury notes.

In brief review we bring to notice some of the incidental powers exercised by virtue of the clause under consideration, to show the liberal construction it has hitherto received. Less questionable ones might be produced; but that the argument may be of the strongest character, the following have been selected. The power to lay an embargo, 2 Story on Const. chap. 27; the power to establish a military academy, Id. sec. 1281; the power to pass alien and sedition laws, Id. secs. 1293, 1891; the power to give priority to the United States as a creditor, Id. sec. 1278; *U. S.* v. *Fisher*, 2 Cranch, 202; *United States* v. *Howe*, 3 Id. 73; *Thelluson* v. *Smith*, 2 Wheat. 396; *Conard* v. *Atl. Ins. Co.*, 1 Pet. 388; the power to

protect domestic manufactures, 1 Story on Const. secs. 958–966. And for a further summary, *vide* Walker's Am. Law, chap. 10.

Clear and indisputable as this position is, there is another which sustains our views in regard to the constitutionality of this Act of Congress.

Section eight, subdivision five, empowers Congress "to coin money, regulate the value thereof, and of foreign coin." This power is vested exclusively in the Federal Government. (Const. U. S. Art. 1, sec. 10.) Individual States are prohibited from exercising it; and appellant claims that this power, rightly interpreted, authorizes the issuance of these notes; that the issue of them is coining money; that the obvious meaning of the clause is, that Congress shall have full power to create money.

To support this view, we ask the Court's attention to the definitions of the words "coin" and "money," and then to the consideration of the legal rules of interpretation and construction applicable to the Constitution.

Webster defines the verb "coin:"—"1. To stamp metal and convert it into money; to mint. 2. To make or fabricate for general use. 3. To make; to forge; to fabricate." He also declares the word to mean, primarily, "striking, impressing, imprinting money." Coinage is defined "a making; a production; a formation."

Worcester defines "coin," verb: "1. To convert into money. 2. To fashion or form by stamping. 3. To invent; to fabricate." "Coinage, the art or the act of coining money."

Barclay defines coinage to be "the stamping of metals or making money."

"Coinage is the art of fabricating money." (Ency. Britan. vol. 7, page 67.)

"The States cannot coin money; can they then coin that which becomes the actual and almost universal substitute for money?" (See Webster's speech on the Bank of the United States, May 25th to 28th, 1832; Story on Const. sec. 1120.)

"Money is a measure of value and medium of exchange." "Coinage is the art of fabricating money." (Ency. Britan. cited above.)

Money: the medium of exchange used by any people. At the present day, among civilized nations, confined entirely to metallic coins and bank notes. (New Am. Cyclo. vol. 10, p. 644, article "money.")

Money : bank notes or bills of credit issued by authority are also called money. (Webster's Dic.)

Money : cash generally ; any current token or representative of value—as bank notes exchangeable for coin, notes of hand, accepted bills on mercantile houses, drafts, etc. (Wright, as quoted by Worcester.)

Money: originally stamped coin, is now applied to whatever serves as a circulating medium, including bank notes and drafts, etc. (Worcester.)

" Money is the very hinge on which commerce turns. And this does not mean merely gold and silver ; many other things have served the purpose with different degrees of utility—paper has been extensively employed," etc. (Hamilton on the Bank ; Story on the Constitution, 152, note.) " Money " is the measure of value. (Lord Mansfield, as quoted 21 Penn. 178.)

Much more might be added, but enough, we trust, has been said to show that the words " coin money " cannot be restricted to the imprinting, pressing or striking gold and silver, or metal of any kind merely.

The verb " coin," as determined by the authorities above cited, means to impress or strike ; to make, create or fabricate ; and the word "money " is defined to be "a medium of exchange authorized by a government." What the thing or material shall be, out of which money shall be composed, is left by the Constitution with Congress to determine.

The power of coinage is given to Congress, but as regards the subject matter upon which the power shall be exercised, the Constitution is wholly silent. The power is given, but the means by which the power shall be made operative are left to the discretion of Congress. When, therefore, Congress determines that certain paper, bearing the impress of the Government, shall be lawful money of the United States, the same is money, and is produced under the power of Congress " to coin money, and regulate the value of foreign coin."

This interpretation of the words under consideration cannot be viewed with disfavor, nor pronounced strained and forced.   It is fully sustained in principle by the decisions of the Supreme Court of the United States, in cases of like character and analogous to the one at bar.   We refer the Court to Story on the Constitution, chap. 5, secs. 422, 423, 428–434, 454; the Federalist, Nos. 32, 33, 44; Walker's Am. Law, chap. 10; Sedgwick on Constitutional and Statutory Law, 488–93; *McCulloch* v. *State of Maryland,* 4 Wheat. 316, 402–6; *Ogden* v. *Saunders,* 12 Id. 332; *Gibbons* v. *Ogden,* 9 Id. 1, 189; *Martin* v. *Hunter's Lessee,* 1 Id. 304, 326, 327; *Sturgis* v. *Crowninshield,* 4 Id. 112, 202; *Anderson* v. *Dunn,* 6 Id. 204, 226; *Ros* v. *Jingey,* 4 Dal. 37; *United States* v. *Fisher,* 2 Cranch, 358; *Cross* v. *Harrison,* 16 Howard; 2 Dal. 419; 1 Kent, 318, 9th edition.

The question now to be asked is: May the money which the Government, under the Constitution, is authorized to coin, (create) be made a legal tender by Government?

We cannot but think that the question answers itself in the affirmative, though aware that it was the subject of much debate in Congress when the clause was inserted in the act, and is still a question of much diversity of opinion among able lawyers.

Can it be that the Government has the power to create money, yet having created it, lacks the power to impress it with that which alone gives it value—alone makes it what it professes to be, money? Is the power of Government exhausted in the mere creation?   Is Congress concerned with only a name, not a thing—a shadow, not a substance?   If so, Congress can create the inanimate thing and employ it, if it be capable of being so employed, but cannot breathe into it the vital spirit which alone can bring it into useful existence. (C. J. Marshall, 9 Wheat. 861.)

II.   That Congress has exercised this power, we apprehend will not be denied.   (See the Act, sec. 1.)

III.   Having demonstrated, as we think, to the Court that Congress, under the Constitution, has the power to create these treasury notes, make them lawful money—a legal tender in payment of all debts, public or private, within the United States, and that it has exercised this power, we have shown that every individual within

these States is obligated to receive them in payment of debts. This much of our third proposition is clear; for whatever construction may be given to the words "public debts" as applicable to taxes due the State, a private debt must mean a debt existing between individuals, whether they be natural persons or artificial persons created by law. The act cannot, by the words private debts, refer to the debts of the State, as such construction would do violence to the word "private;" and, of course, it cannot refer to the debts of the United States, as that would do still greater violence to the words "private" and "within." The act does not read debts *of* the United States, but *within* the United States. In other words, it is plain that these notes are a legal tender in payment of every debt within the United States, except taxes. That such was the intention of Congress is evidenced by the debates upon the passage of the act.

It remains to discuss the question, Is the State bound to receive them in payment of its taxes?

To this we say, that the law of Congress evidently intends to include taxes, and this intention is clearly expressed in the words of the act. The language, "shall be lawful money and a legal tender in payment of all debts, public and private, within the United States," is simple, clear and comprehensive.

What is the meaning of the word debt?

Richardson defines it: "Anything had or held of or from another, his property or right, his due; that which is owed to him; which ought to be delivered or paid to him."

Webster says it is: "That which is due from one to another, whether money, goods or services; that which one is bound to pay or perform to another.".

Worcester: "Debt, (from the Latin *debitum*, *debeo*—to owe) that which one person owes to another, whether it be money, goods or services; something due; obligation; due."

"Debt: that which one person owes to another; that which any man owes to another." (Barclay.)

"Debt (contracts) is a sum of money due by certain and express agreement. In a less technical sense, it means any claim for money. In a still more enlarged sense, it denotes any kind of a just demand." (Bouv. Law Dic.)

"Debt: obligation, liability." (Thesaurus of English Words, Roget.)

Thus it is seen that the word "debt" means liability, obligation; that which is due; that which should be performed, whether in money, goods or services.

Can it be pretended that a tax does not fall within these definitions? That taxes are not obligations due? That they are not liabilities which should be paid? If not paid, are they not recognized and treated as debts to the State, and their payment enforced by ordinary judicial proceedings in almost every county of the State? This idea was not only evidently latent in the minds of the law makers, but is practically expressed. (Revenue Law, 1861; Statutes of 1861, 432.)

But why discuss this point. This Court has judicially declared that a "tax is a debt due from the property-holder to the State." (*Moore* v. *Patch*, 12 Cal. 270; *People* v. *Seymour*, 16 Id. 342; 28 Miss. 70–74.)

And what construction is to be placed upon the term *public* and *private*, found in the statute?

"Shall be a legal tender in payment of all private and public debts within the United States," words singularly expressive, concise and significant.

Are they to be ignored? Have they no meaning? Have they any other meaning, upon any rule of fair construction known to the law, than a payment of all debts between individuals, and between individuals and the State?

If taxes are included within the meaning and intent of the words "all debts, public and private," (19 How. 452–3–4) the question remains for consideration: Has Congress the power to enact a law making State taxes payable in these notes?

It may be argued that the power to tax is vested in the State; that in the exercise of her sovereignty she may tax all persons and property within her borders; that such power is vital to the existence of the State, and cannot be abridged by the Federal Government. And all this we do not deny, and are not wholly ignorant of those principles, nor of the authorities which sustain them.

But we contend that they are not pertinent to the issue here

made. Undoubtedly, a State has the inherent power to impose taxes on persons and property. Cannot the State, then, say in what the tax shall be collected—in what specific thing, whether grain, land, service, money—what particular kind of money, gold, silver or paper? We answer, under its power of taxation, it cannot, and that is the only power which is pretended to have been exercised by the State in its Revenue Act. In the exercise of its power of taxation, the State can take or enforce the payment of money only from its citizens.

It does not militate against this view, that Government may seize and sell the property of the citizen to enforce the payment of its taxes. The creditor of every delinquent debtor may cause the same to be done—it is only a means to accomplish an end. The end in each case is to raise money; the seizure and sale only the means.

In either case, if property be sold to satisfy execution, must not whatever is made money and a legal tender by the Government be accepted by the Sheriff in payment? Can he discriminate, and say in one case I will receive paper money, and in the other only gold and silver? If not, why is not that which is payment at the end of an execution, equally a tender, and receivable for the original debt or obligation?

If we are asked, by what right does the State take a specific thing, such as land, grain, etc., at its pleasure, if not by the power of taxation; we are ready with our answer—by the power of eminent domain.

The two powers—taxation and eminent domain—are independent, separate and distinct, and wholly different in their nature and character; and both are independent of another power, inherent in every State, known by the latitudinarian name of "police power."

The universal definition of taxation, or the right of taxation, is the power of Government to raise money. (Sedgwick on Constitutional Law, ch. 10, particularly from page 498 to 511, and cases cited; *People* v. *Mayor of Brooklyn,* 4 N. Y. 419, overruling the same case in 6 Barb. 214; *Town of Guilford* v. *Supervisors, etc.,* 13 N. Y. 147; *Sharpless* v. *Mayor of Philadelphia,* 21 Penn. 147; Id. 9 Harris; *Moers* v. *City of Reading,* 21 Penn. 188;

*Schenby and Wife* v. *City of Alleghany*, 25 Id. 128 ; *Police etc.* v. *McDonogle's Succession*, 8 La. Ann. R. 341 ; *New Orleans* v. *Grahle*, 9 Id. 561.)

With reference to "police powers," see *Fisher* v. *McGirr*, 1 Gray, 26–41 ; *American Print Works* v. *Lawrence*, 1 Zabriskie ; *Surocco* v. *Geary*, 3 Cal. 71.

IV. That a constitutional law of Congress, made to extend to the separate States, repeals any State law not in harmony with it, is amply sustained by authorities cited in the course of this argument, and is not susceptible of discussion. (Const. U. S. art. 6, div. 2.)

And apart from the question of power, the Revenue Law of the State, in so far as it conflicts with the Congressional Act, is constructively repealed. (*Pierpont* v. *Crouch*, 10 Cal. 216 ; *City, etc. of Sacramento* v. *Bird*, 15 Id. 294 ; *State* v. *Conkling*, 19 Id. 513.)

V. *Mandamus* is the proper remedy. We refer the Court to the Revenue Act itself (Statutes 1861, page 430, sec. 33). The duty made to devolve upon the Tax Collector by section thirty-three, can be enforced by *mandamus*. The appellant is entitled by law to have his receipt, and the word " paid " marked opposite his name, etc. (Sec. 33.) We refer to *McCauley* v. *Brooks* (16 Cal. 15) for authorities, and to the ruling of this Court in that case.

*Horace Hawes*, also for Appellant.

The Act of Congress in question provides that the United States notes, to be issued in pursuance of the first section, shall not only be receivable in payment of all taxes and other debts (with certain exceptions) due to the United States, (which was clearly within the power of Congress) but also that they shall be " lawful money, and a legal tender in payment of all debts, public and private, within the United States."

That the terms used in this latter clause embrace taxes and other dues to the public treasury, there is scarcely room for doubt. "All debts, public and private." It would be difficult to invent language more simple and comprehensive. A debt, according to

Webster, is " that which is due from one man to another, whether money, goods or services; that which one is bound to pay or perform to another." Every man is bound to pay his quota of the public burdens. When it is ascertained and fixed by authority, it becomes a debt which he owes the State.

Public taxes, when lawfully imposed, are certain contributions exacted from the citizens for the support of Government. These contributions are apportioned in various ways — sometimes *per capita;* sometimes in proportion to the value of each one's possessions; sometimes by fixed amounts imposed upon those pursuing certain trades, professions or occupations. In whatever mode the exaction is made, if rightful, a corresponding obligation rests upon the citizen to pay the amount exacted. He owes that amount to the public treasury—to the State. It is a public debt. Consequently our Revenue Act of 1861 provides for the enforcement of this obligation as a personal debt, by an ordinary action at law against the delinquent, and by summary seizure and sale of any property belonging to him. (See sections 30, 39–44, 66, 77.) Personal judgments are to be rendered, and these judgments are to be liens upon all property of the defendant, as in other cases. (Section 44, above cited.) Certainly, the amount due upon such a judgment is a debt, even in the old technical sense. But it is equally a debt before judgment, for no judgment can rightfully be rendered against any man for that which he does not owe.

The Government, in the exercise of its prerogative, declares United States notes to be lawful money. Certainly, lawful money ought to satisfy all debts due to the public treasury; and the more so, when this money consists of the obligations of the Government itself. For the State to repudiate its own paper, which it has declared to be lawful money, and refuse to receive it in satisfaction of any public dues, would discredit it effectually. But the Government has gone further, and declared its notes to be not only lawful money, but a legal tender in payment of all debts. It obliges every person to receive them as money, and henceforth dispenses with payments in gold and silver. To exact gold and silver when it has dispensed with it in commerce, and when, consequently, it is ordinarily unattainable, would be unjust and oppressive.

It has been said that the State, having the power to levy and collect taxes, may provide for the payment thereof in coin, as the State of California has done; and that is very true. But it is equally true, that the State law may prescribe that all debts shall be paid in coin, as our law undoubtedly has done. The law which requires that private debts shall be paid in coin had the same origin, and is of the same dignity and force, as that which requires that taxes shall be paid in coin. Both emanate from the sovereign power of the State. And yet this Act of Congress is paramount, and repeals them, if it is constitutional.

There is a vague notion that any Act of Congress is unconstitutional which derogates from State sovereignty. The Federal Constitution has no such provision. It says nothing about State sovereignty. Every legislative power that Congress possesses necessarily derogates from State sovereignty; for the sovereign has power to make laws for all cases. In so far as this power is restricted, the State is not sovereign. But, in many instances, the sovereign or legislative power is by the Federal Constitution taken away from the States and given to Congress. All this is derogatory to State sovereignty. The Constitution itself is derogatory to State sovereignty. The question of constitutionality, therefore, turns not upon the point whether the act derogates from State sovereignty, but whether it is authorized or prohibited by any particular clause in the Federal Constitution. If there be any clause in that instrument giving to Congress the power to make anything but gold and silver a legal tender in payment of private debts, that clause will be found equally to authorize Congress to make it a legal tender for public taxes—for " all debts, public and private, within the United States."

*H. H. Haight*, for Respondent.

There are two questions involved. 1st. One of construction and intent. Did Congress design to enact that the treasury notes should be a legal tender to State officers for taxes imposed by State revenue laws? 2d. A question of power. Can Congress make paper money a legal tender for private debts; and if so, can that

22

body control State legislation upon the currency in which State taxes are to be paid ?

I.    If it were admitted that Congress possessed any power at all to make paper money a legal tender, and the State revenue act were silent as to the currency in which taxes should be collected, the Act of Congress might then be properly invoked by the petitioner, for the inference then would be that the State authorized the acceptance of any currency legalized by Congress.

The language of the Revenue Act, (Stat. of 1857, 326, sec. 1) however, is that the taxes shall be paid in coin of the United States, or foreign coin at its legal value.    This is tantamount to prohibiting the collecting officers from receiving anything else in lieu of coin.    The word " coin " has a fixed and definite signification.    In its derivation and invariable use, it signifies a piece of metal prepared and stamped with a die, to circulate as money. This is the literal grammatical sense of the word " coin," and the only sense in which it is ever used when applied to money.

The primary meaning of the word was the die used for stamping metals, and thence it was applied to the metals stamped.    There is a metaphorical and figurative sense in which the word is used, as " to coin a word," or " the coinage of the brain," in Shakspeare ; and " to coin an excuse or a lie," conveying the idea of fabrication, invention or forgery ; these uses, however, of the word, have no reference to its literal legal definition and meaning.    The argument of the appellant is really to the effect, that the Legislature and the framers of the Federal Constitution used the word in its metaphorical and hyperbolical sense.

That the verb " to coin," metaphorically used, means " to invent, forge or fabricate," is undoubted ; but these figures of speech are not conveyed in the term when applied to money.    Since the Act of Congress was passed, thousands of contracts in this State have been made payable in " current coin."    Is this expression equivalent to " current inventions, forgeries, fabrications, or current paper issues ?"    Is it possible for any one to mistake the meaning of the term as used in the Revenue Act, or doubt that it imports gold and silver instead of every species of paper issues ?    The Revenue Act in this respect expresses the deep rooted and traditional antipathy

of the people of this State to the use of anything but coin as a circulating medium. (State Constitution, art. 4, secs. 34, 35.) The latest authority on this subject, the New American Encyclopedia, gives not the least color to the use of the word " coin " in any such sense as that contended for by appellant. It defines coin to be " metallic money," " specie," " pieces of metal bearing certain marks," etc., and this is the only definition hinted at in a long article of several pages.

Webster, in defining the noun coin, defines it to be: " 1st. Money stamped; a piece of metal, as gold, silver, copper or other metal converted into money by impressing on it certain figures, etc. 2d. A die in architecture. 3d. That which is received in payment, as ' The loss of present advantage to flesh and blood is repaid in a nobler coin.' "

The figurative use of the word in the last definition is made apparent by the example. So in defining the verb " to coin," the definitions in Webster are given as follows: " 1st. To stamp a metal and convert it into money. 2d. To make or fabricate for general use, as to ' coin words.' 3d. To make, forge or fabricate in an ill sense, as to coin a lie; to coin a fable."

The above are all the definitions given by Webster. Do they give the least countenance to the use of the word contended for by the appellant ?

Richardson, in defining the word to signify " an iron seal with which metal is stamped, and hence money is called coin," gives the other definition: " To coin [met.] is to forge; to invent." The abbreviation in brackets shows that this use of the word is purely metaphorical.

Bouvier, in his Law Dictionary, defines it to be " a piece of gold, silver or other metal stamped by authority of the government, to determine its value, commonly called money."

It is safe to assert, that in the whole range of English literature no single instance can be produced of the word " coin " being used in connection with money, to signify anything but a piece of metal stamped as defined by Bouvier.

In Rees' Cyclopedia, volume nine, title " Coin," after saying that coin is a piece of tempered steel used as a die, the author defines

coin " to be more generally used for a piece of metal stamped with certain impressions to give it a legal and accurate value, and to serve as a guaranty for its weight and purity. Coin differs from money as the species from the genus. Money is any matter to which public authority has affixed a value, and which serves as a circulating medium, whether metal, paper, leather, shells, etc.; but coin is a particular species of money, always made of metal, and struck according to a certain process."

Dr. Johnson, in his day, does not seem to have suspected that money signified anything but a metallic currency. He defines " coin " to be " money stamped with a legal impression," and money to be " metal coined for the purposes of commerce."

Worcester defines " coin " to be " a piece of metal bearing a legal stamp, and made current as money," and then gives its metaphorical and poetical use as " that in which payment is made."

In Homan's Cyclopedia of Commerce, the definition is : " Coins —pieces of metal, most commonly gold and silver or copper, impressed with a public stamp, and frequently made a legal tender in payment of debts."

In the English Cyclopedia, part " Arts and Sciences," volume three, the definition is " coin ; metal stamped for currency."

In the Encyclopedia Britannica, the definition is : " Coin : a piece of metal converted into money by the impression thereon of certain marks or figures ; coin differs from money as the species from the genus."

In the National Cyclopedia, the definition is, " metal stamped for currency."

In M'Culloch's Commercial Dictionary, the definition is, " pieces of metal, most commonly gold, silver or copper, impressed with a public stamp, and frequently made a legal tender."

Against this array of authorities can it be pretended that " coin " means paper money, and " coining signifies the emission of treasury notes ?" Yet this is the whole of the appellant's argument.

It would have been deemed unnecessary to make more than a passing reference to the definition of the word coin, but that the appellant's counsel find it necessary, in order to sustain their position, to argue that coin may signify a paper currency. This point

will be briefly alluded to again in considering the provisions of the Federal Constitution.

We assume, then, that the State Revenue Act requires the payment of taxes in gold and silver. It results that if Congress has required the State Governments to receive treasury notes in payment for taxes, there is a conflict between our State law and the Act of Congress, and if Congress has legislated within its constitutional powers, the State law must yield.

Do the terms used in the Act of Congress imply that the treasury notes provided for shall be a legal tender for State taxes? The language of the act is not very definite or precise. It is not very clear whether public debts signify debts due by the public or to the public. If the phrase, "all debts, public or private," includes debts due to the Government, as well as debts due by it, it becomes important to inquire whether taxes are debts within the meaning of the act.

There is a prevalent impression that this Court has held contrary to the current of authority, that a tax is a debt, and this impression is founded in part on the case of *People* v. *Seymour* (16 Cal. 342). The report presents a discrepancy between the syllabus of the case and the opinion; for although the reporter in the head note announces such a decision, upon examining, it will be seen that the Court expressly declines to decide the point.

That a tax is simply a charge or burden levied by the Government to provide revenue; that it involves no idea of contract or indebtedness, and does not create the relation of debtor and creditor, would seem to be apparent; and on this point the Court is referred to the following authorities: Bouvier "Debt" and "Tax;" *People* v. *Seymour*, 16 Cal. 342; Blackwell on Tax Titles, 205; *Pierce* v. *City of Boston*, 3 Met. 520; *Thompson* v. *Gardner*, 10 Johns. marg. page, 404; *Shaw* v. *Pickett*, 26 Vt. 482; *City of Camden* v. *Allen*, 2 Dutcher, (N. J.) 398; *Mechanics' and Traders' Bank* v. *Debolt*, 1 Ohio, 591; 1 La. Ann. 435. The term debt, as used in the Act of Congress, is used in its ordinary legal sense, conveying the idea of contract as defined by Bouvier.

That the Legislature has the power to frame a Revenue Act defining a tax to be a debt, is probable; but the Act of Congress is

not framed with reference to any particular State statute, but in view of the general course of legislation. In the case in 16 Cal. it is laid down, that if a tax is merely a charge on property, it cannot be denominated a debt.

Taxes are commonly a charge on property, and if our State Revenue Act had placed a tax on the footing of a debt, and the Revenue Act of Illinois made it a mere charge on property, would treasury notes be receivable here for taxes when they would not be in Illinois? This illustrates the absurdity of attempting to make the Act of Congress apply to State revenues at all, for in that case the treasury notes might be a legal tender in one State and not in another.

The language of the act seems, by the strongest implication, to negative the idea that Congress designed to make the notes receivable for State taxes. It provides, that " such notes herein authorized shall be receivable in payment of all taxes, internal duties, excises, debts, and demands of every kind due to the United States, except duties on imports, and of all claims and demands of the United States, of every kind whatsoever, except for interest upon bonds and notes, which shall be paid in coin, and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

The act provides that the notes shall be receivable for taxes due the United States, which is equivalent, on familiar rules of construction, to an express declaration that they shall not be receivable for taxes due the several States. The act itself also makes an unequivocal distinction between the terms " debts " and " taxes," speaking of them separately as distinct, and rendering the construction sought to be given by the appellant impossible. This view of the Act of Congress, it is submitted, is the only one at all consistent with its terms, and disposes of the case.

It is certain, in view of the jealousy by the States of Federal encroachment, that if Congress had designed to attempt the delicate and invidious task of controlling the collection of the revenues of the States from their own citizens, the intention would have been so clearly expressed as not to admit of doubt.

II.   It is not necessary, however, to rest the case on construction alone.   There is another question involved of incalculable importance and interest, upon which it is both desirable and necessary to have the judgment of the Court, to wit: the question of constitutional power; and this, as already intimated, resolves itself into two propositions: 1st. That Congress has no power to make paper money a legal tender for debts of any description.   2d. That if it had this power, as between individuals and toward the Federal Government, it cannot compel the States to collect their revenues in paper.

The affirmative of the first proposition, if it were admissible, by no means involves the second.   The Federal Government, to quote the language of Chief Justice Marshall, is acknowledged by all to be one of enumerated powers.   (*McCullough* v. *The State of Maryland*, 4 Wheat. 316.)   That it can exercise only the powers granted to it is, as he says, universally admitted.   This principle of construction of the Federal Constitution, first judicially declared by Chief Justice Marshall, (himself a Federalist) has been sanctioned by all the eminent men of all parties who participated in framing the system, and who have since that period shared in its administration.

The eighth section of the first article contains the definition of the powers granted to Congress, among which are the powers to " borrow money on the credit of the United States," and " to coin money and regulate its value," and closes with empowering it "to make all laws which shall be necessary and proper to carry into execution the foregoing powers."

The last clause, it will be conceded, neither enlarges nor restricts the powers enumerated; for as Mr. Hamilton remarks in the thirty-third number of the " Federalist," in speaking of this clause and the clause asserting the supremacy of the Constitution and laws of the United States, these clauses " are only declaratory of a truth which would have resulted by necessary and unavoidable implication, from the act of constituting a Federal Government and clothing it with certain specific powers."   Judge Story expresses the same idea in his Commentaries.

No loose and latitudinarian construction of this clause, therefore,

can add to the power of Congress.    The Constitution with it is the same as it would be without it.

Much stress is laid by the appellant's counsel upon the cases in 4th and 9th Wheaton, affirming the constitutionality of a United States Bank ; ·but a slight examination of these cases will show that they have no bearing in favor of the power claimed in this case.

The question discussed in them was not the power of Congress to make paper money a legal tender, nor is there a syllable in those decisions, nor in any decision of the Supreme Court of the United States, or any other respectable Court, which looks toward an admission of such a power.

The whole question was as to the right of Congress to create a corporation for the purpose of aiding the Government in the execution of its powers.    This right is treated in those decisions, and also in Judge Story's Commentaries, not as a power, but as a simple means or agency to assist in the execution of the powers of the Government.

The cases cited have no bearing in favor of a power to make paper money a legal tender for debts.    This is a power that emphatically " comes home to the business of all," and is one of vast proportions—rarely exercised by governments the most despotic, and never exercised by any without injurious consequences, sooner ·or later, to the commerce and prosperity of the nation.    This power is not inferior in any respect to any power granted in the Constitution, much less is it implied.    The greater can never be implied in its inferior, nor the equal in its equal.

The Federal Constitution, in giving Congress the power to coin money, wisely abstained from conferring the power to make unlimited paper issues and force them on the people ; a power not only liable, but morally certain to. end in flagrant abuse.    It is a power which cannot tend to beneficial results, because the paper of the Government derives its value from · the confidence of the people, which is the basis of its credit, and this confidence is not the creature of compulsory legislation.    The expediency of this legislation, however, will be hereafter referred to.    The argument at present simply is, that so vast a power can never exist by doubtful implication, and it is morally certain that the convention, for wise reasons, carefully abstained from granting it.

The uniform practice of the Government hitherto, since its origin, which was used as an argument in favor of the Bank charter, weighs against this power.   The Government has existed now for nearly three-quarters of a century, and has passed through periods of war, of commercial revulsions, and general financial derangement; but it has never until this hour claimed or exercised the power in question.   Occasions have heretofore occurred, as in 1812, in which, if the exercise of it was desirable at any time, it was expedient then; but Congress has never before claimed the right to substitute its own paper for gold and silver in the business transactions of the people.

Even now the design of this act is not the regulation of the currency, but to supply the financial necessities of the Government; and nothing shows in a more glaring light the fallacy of the argument which rests this power on the clause " to coin money."

The object is really to borrow money from the people by forcing them to use Government paper in business transactions; and it was supposed the validity of the provision would be rested, not on the power to coin, but the power to borrow, for this is what the transaction was in truth designed to accomplish, though we think it can be shown that it does not tend to do so.   The currency of the country needed no aid from Congress.

It will not be pretended that the currency of California or the Eastern States is to be improved, by substituting for specie the inconvertible notes of the Government.   Even the paper money of State banks is, in theory, convertible into coin at any moment, and is not a legal tender.   No one is compelled to take it.   The only legal currency of the Eastern States is gold and silver.

If the Convention of 1787 had designed to make the power of Congress so broad, it would have added to the phrase to coin money, or to borrow money, the phrase " to emit bills of credit, and to make them a legal tender for debts."

How would the Convention, composed of statesmen who had passed through the era of Continental money, worth two dollars a bushel, have received such a proposition?   This inquiry will be answered presently by seeing how the Convention did receive the proposition when it was made, as it was in fact.

If the Government, under this clause, can make its own paper a legal tender, then it can the bonds of New York City or State, or the paper of the New York banks, or Arkansas bonds, or the paper of any private association or individual. It is incredible that such a monstrous stretch of power can gravely be claimed for a Government like ours.

No one, surely, will venture before this tribunal, to set up the claim that the present rebellion has changed in any respect the nature of our system, or the rules by which the Constitution of our country has been hitherto construed.

The powers granted to Congress are now what they were in 1790, and in 1812.

Appellant's counsel rest the power of Congress on the clause relating to coin, and it has not, therefore, been deemed necessary to refer to any other clause. The clause empowering Congress to borrow money, it is not pretended confers on it the right to make Treasury notes a legal tender, and it has not been thought necessary to make in reference to this clause any extended remarks. The words "borrow and lend" signify voluntary action on the part of the lender, and differ widely from the power to make paper a legal tender. Appellant's counsel have therefore wisely abstained from resting their case upon that clause.

This matter, however, is not left to negative construction. The power to make paper money a legal tender for debts is spoken of in the Constitution itself as a distinct and independent power from the power either to emit bills of credit or to coin money.

In section ten of article one, the States are prohibited from the exercise of certain powers specified, some of which are expressly granted to Congress, and some of which are withheld. Among the powers specified in that section, are the powers " to coin money," " to emit bills of credit," " to make anything but gold and silver coin a tender in payment of debts," " grant letters of marque and reprisal," " enter into treaties," etc.

Of the powers specified, the Federal Executive is allowed the power to enter into treaties; Congress is allowed, in the eighth section, the power to coin money, to grant letters of marque, but the power to make anything but gold and silver a tender in payment of debts is carefully withheld.

Perry *v.* Washburn.

It cannot be pretended that the Convention supposed this power was involved in the power to coin money, because then there would have been no necessity to specify it; and after specifying it as a separate power, it would most certainly have been enumerated among those granted, if it had been the design that Congress should ever exercise such a power. This conclusion seems inevitable.

The prohibition of the States to exercise such a power was necessary, for otherwise the States could have exercised it; but it was of course unnecessary to prohibit Congress from its exercise, because unless expressly conferred, it could not be claimed by the Federal Government, more especially as any implication was negatived by the prominence given this power among those prohibited to the States.

The Supreme Court of the United States, in the case of *Craig* v. *The State of Missouri*, (4 Peters, 411 and 433–4) hold that, " The Constitution considers the emission of bills of credit and the enactment of tender laws as distinct operations, independent of each other, which may be separately performed. Both are forbidden."

Judge Story, in his Commentaries, uses the same language. We have, therefore, the highest authority that the emission of bills of credit, and the making them a legal tender, are distinct powers in the Constitution; and, on the same ground, *a fortiori*, the power to coin money is distinct from either and from both.

But this is not all, though it might well be deemed conclusive. We are fortunately furnished with a complete demonstration, almost equal in authority to an express prohibition.

The framers of the Constitution understood its scope and intent, and if the opinions of its framers can be ascertained, expressed at the time of its formation, it will be at once admitted that their judgment is authoritative and conclusive.

The members of the Convention of 1787 were not only the purest patriots, but the greatest men our country has produced. They expended weeks of painful labor in perfecting its phraseology, and in making its provisions clear and exact. The original draft of the Constitution, as found in the fifth volume of Elliott's Debates, on

page three hundred and seventy-eight, contained the following clause in what is now section eight of article one : " To borrow money and emit bills on the credit of the United States."

On referring to the debate on the motion of Gouverneur Morris to strike out the words " emit bills," a debate occurred, which will be found on pages four hundred and thirty-four and five of the same volume, and which sets the matter so completely at rest that I extract the whole of it :

" Mr. Gouveneur Morris moved to strike out ' and emit bills on the credit of the United States.' If the United States had credit, such bills would be unnecessary ; if they had not, unjust and useless.

" Mr. Butler seconds the motion.

" Mr. Madison—Will it not be sufficient to prohibit the making them a tender ? This will remove the temptation to emit them with unjust views ; and promissory notes in that shape may, in some emergencies, be best.

· " Mr. Gouverneur Morris—Striking out the words will leave room still for notes of a responsible minister, which will do all the good without the mischief. The moneyed interest will oppose the plan of Government, if paper emissions be not prohibited.

" Mr. Gorham was for striking out without inserting any prohibition. If the words stand they may suggest and lead to the measure.

" Mr. Mason had doubts on the subject. Congress, he thought, would not have the power, unless it were expressed. Though he had a mortal hatred to paper money, yet, as he could not foresee all emergencies, he was unwilling to tie the hands of the Legislature. He observed that the late war could not have been carried on had such a prohibition existed.

" Mr. Gorham—The power, as far as it will be necessary or safe, is involved in that of borrowing.

" Mr. Mercer was a friend to paper money, though in the present state and temper of America, he should neither propose nor approve of such a measure. He was consequently opposed to a prohibition of it altogether. It will stamp suspicion on the Government to deny it a discretion on this point. It was impolitic also to

excite the opposition of all those who were friends to paper money. The people of property would be sure to be on the side of the plan, and it was impolitic to purchase their further attachment with the loss of the opposite class of citizens.

" Mr. Ellsworth thought this a favorable moment to shut and bar the door against paper money. The mischiefs of the various experiments which had been made were now fresh in the public mind, and had excited the disgust of all the respectable part of America. By withholding the power from the new Government, more friends of influence would be gained· to it than by almost anything else. Paper money can in no case be necessary. Give the Government credit, and other resources will offer. The power may do harm, never good.

" Mr. Randolph, notwithstanding his antipathy to paper money, could not agree to strike out the words, as he could not foresee all the occasions that might arise.

" Mr. Wilson—It will have a most salutary influence on the credit of the United States to remove the possibility of paper money. This expedient can never succeed whilst its mischiefs are remembered, and as long as it can be resorted to, it will be a bar to other resources.

" Mr. Butler remarked that paper was a legal tender in no country in Europe. He was urgent for disarming the Government of such power.

" Mr. Mason was still averse to tying the hands of the Legislature· altogether. If there was no example in Europe, as just remarked, it might be observed on the other side, that there was none in which the Government was restrained on this head.

" Mr. Read thought the words, if not struck out, would be as alarming as the mark of the beast in Revelation.

" Mr. Langdon had rather reject the whole plan than retain the three words ' and emit bills.'

" On the motion for striking out, New Hampshire, Massachusetts, Connecticut, Pennsylvania, Delaware, Virginia, North Carolina, South Carolina, Georgia—*Aye*, 9 ; New Jersey, Maryland—*No*, 2.

" The clause for borrowing money was agreed to *nem. con.* Adjourned."

To this report the editor adds the following note:

"This vote in the affirmative by Virginia was occasioned by the acquiescence of Mr. Madison, who became satisfied that striking out the words would not disable the Government from the use of public notes, as far as they could be safe and proper, and would only cut off the pretext for a paper currency, and particularly for making the bills a tender, either for public or private debts."

The Convention, therefore, out of abundant caution, struck out the clause "to emit bills," and this debate sheds a flood of light on the intent of the framers of the Constitution, and as a cotemporaneous exposition is justly entitled to the greatest deference; though, as already said, the language of the instrument itself is demonstration sufficient of the intention to deny Congress this power.

After such testimony, it seems almost a work of supererogation to add anything more, and on this branch of the case we close with two additional authorities.

The first one is the case of *Gwin* v. *Breedlove*, (2 How. 29 and 38) in which the Supreme Court of the United States say: "By the Constitution of the United States, (section ten) gold or silver coin, made current by law, can only be tendered in payment of debts;" or, as expressed in the head note, "The Constitution of the United States recognizing only gold and silver as a legal tender."

The other is the great defender of the Constitution, Mr. Webster, who, in a speech in the United States Senate, delivered December 21st, 1836, (to be found in Appendix to Congressional Globe, page 54, 24th Cong., 2d Sess.) expresses himself as follows:

"But if we understand by currency the legal money of the country, that which constitutes a legal tender for debts, and is the statute measure of value, then undoubtedly nothing is included but gold and silver. Most unquestionably there is no legal tender, and there can be no legal tender in this country, under the authority of this Government or any other, but gold and silver, either the coinage of our own mints, or foreign coins at rates regulated by Congress. This is a constitutional principle, perfectly plain, and of the very highest importance.

" The States are expressly prohibited from making anything but gold and silver a tender in payment of debts, and although no such express prohibition is applied to Congress, yet, as Congress has no power granted to it in this respect but to coin money, and to regulate the value of foreign coins, it clearly has no power to substitute paper or anything else for coin, as a tender in payment of debts and in discharge of contracts.

" It has coined money, and still coins it; it has regulated the value of foreign coins, and still regulates their value. The legal tender, therefore, the constitutional standard of value, is established, and cannot be overthrown. To overthrow it, would shake the whole system.          *          *          *          *

" I have already said that Congress has never supposed itself authorized to make anything but coin a tender in payment of debts between individual and individual; but it by no means follows from this that it may not authorize the receipt of anything but coin in payment of debts due to the United States."

The cases cited by the appellant's counsel upon the general subject of the nature of our federal system, and the rules applied to its construction, are familiar to the Court and the profession, and might with equal propriety be cited on either side of this case.

There will be no difference of opinion between counsel as to the rules of construction dictated by reason and sustained by authority. That the Federal Government is one of enumerated powers on one hand, and on the other that the powers granted are to receive a fair and liberal, but not a loose and latitudinarian construction, will not be disputed.

It is in the application of these rules to the subject in hand, that the divergence begins. For this reason it is unnecessary to occupy the time of the Court by quoting from, or commenting upon, the various authorities cited in support of the foregoing propositions. Among the multitude of adjudged cases, the following are simply referred to : *People* v. *Naglee*, (1 Cal. 233) and cases cited in opinion ; 4 Wheaton, 316 ; 11 Peters, 316.

These authorities, it is respectfully urged, are decisive of this case.

It is, however, thought not improper to present also the reasons

why, if Congress possesses the power to make paper a legal tender for private debts, it cannot control the States in the collection of their own revenue ; and this is our second proposition.

The power of taxation is not only one of the highest attributes of sovereignty, but it is its most essential element. To control the power of a State to collect its revenue, would be altogether destructive of its independent action, and would place it, fettered hand and foot, in the hands of Congress, a mere puppet, and a mockery of a government.

Mr. Hamilton, in numbers thirty-three and thirty-four of the Federalist, discusses this concurrent power of Federal and State taxation at length, to show that the power of the State to levy taxes is not affected by the possession of the same power by Congress, and " that the particular States, under the Constitution, have coëqual authority with the Union in the article of revenue, except as to duties on imports."

What becomes of the coëqual power, if Congress could compel the State to accept its paper, or the paper of another State, for its revenue, or *vice versa?* Has a State Government the power to compel Congress to accept the State's obligations for Federal revenues ? If it has not, neither has Congress power to do the same thing to the States, and this, not because of any particular expressions, but because the possession by either of this power makes it possible for it to destroy the other by destroying the food upon which it exists. As man cannot exist without food, so a government cannot exist without revenue. If Congress can force the States to receive any kind of depreciated paper for revenue, it can in effect deprive them of revenue altogether, and in this way accomplish their destruction. That any intelligent man, much more any lawyer, should at this day claim for Congress such a power, must be a subject of profound astonishment. If Congress possesses this power, it would be as well to give it all the power over the State Governments which it chooses to exercise ; and this would in effect be the result.

In 1 La. Ann. 439, the Court say : " The principle that under the American Constitution, no power or individual possesses, directly or indirectly, such an overruling influence over other powers,

as would enable it any time to stop their functions, and to thus disorganize Government, is an axiom—a self-evident proposition."

The right to direct in what currency taxes shall be paid, is an essential ingredient in the power of taxation. There is no such thing as a power of taxation residing in the State, unless it can control and dictate the material or currency in which payment is to be made.

The distinction between the power of taxation and eminent domain, in appellant's brief, does not appear to have any very close connection with the questions involved in this case. The point made by the appellant is, that taxes must be collected in money; that if taxes are collected in anything but money, this is an exercise, not of the taxing power, but of the right of eminent domain, because it is the taking of private property for public use.

The point, however, is that the State may collect its taxes in any kind of money which it chooses. It may authorize the receipt of the bank notes of State banks for taxes due it, as was expressly held by the Supreme Court of the United States, in the case of *Briscoe* v. *Bank of the Commonwealth of Kentucky* (11 Peters, 320–21.)

On the other hand, if the State chooses, it may restrict tax-payers to gold and silver, as in our Revenue Act. All this subject is for the State alone to regulate; because, without the exclusive control of its own revenues, it can only exist by sufferance.

The effect of the provision making Treasury notes a legal tender for taxes upon our State finances and credit, if it were valid, would be disastrous in the extreme.

The State already owes a floating debt of several hundred thousand dollars. Its bonds to the amount of about four millions are mostly held in England and on the Continent.

If its revenue is collected in these Government bills of credit, the State must either pay them out for interest, and violate its plighted faith by forcing the bond holders to receive paper instead of coin, contrary to the understanding upon which the bonds were taken, or the State must sell the paper for gold, at a possible loss of twenty per cent. of its entire revenue.

Practical repudiation or inevitable bankruptcy is the result to the State; in either event, an ineffaceable stain upon her honor.

23

But one other consequence will be referred to. The city of San Francisco has certain creditors who hold her bonds issued under the Act of May 1st, 1851. To secure the payment of those bonds, certain revenues were pledged, and by the same Act (section 4) those revenues were to be collected in "current coin." Where is the "current coin" to come from to save from dishonor the pledge of the State and city, if the appellant's claim receives the sanction of this Court ?

*Frank M. Pixley, Attorney General,* also for Respondent.

I. The right of Congress "to coin money, and to regulate the value thereof," did not give the General Government the right to engage in banking business, to issue paper money, or to make Government notes legal tender for the general use of the nation.

No torture of words can construe "the right to coin money" into the right to emit paper currency, and make it a legal tender in all the transactions of the nation, in payment of debts existing, of obligations to mature, obligations to foreign citizens, duties or debts owing to the different States.

This power was expressly disclaimed by the framers of the Constitution, and has never been affirmatively asserted, as I can find, by any authority.

The attorneys in this case have not placed their argument upon the basis assumed by the advocates of the measure in the Congress of the United States.

The claim of power was rested on a broader basis. It was asserted that the right to declare war, to borrow money, to maintain an army, support a navy, coin money, and regulate the value thereof, and the further grant of power necessary to carry these express powers into effect, by implication, vested Congress with power to create any kind of money, or do anything else necessary to carry on, preserve and maintain the Government; that this issue of notes, with the legal tender clause, was a "war measure;" that the crisis demanded the exercise of all powers necessary to preserve the Government; that, as money was indispensable to the maintenance of an army in the field, a navy in efficient service, Congress had the power to make money, and in order to give that money value, declare it a "legal tender."

Perry *v.* Washburn.

This was an argument arrising from the necessity of the Government; it was addressed to the patriotism of the members of Congress, and it was carried as a war measure.

As a question of financial policy, we are unable to see how the legal tender clause could have been expected to aid the Government in its necessities. It could have paid its own debts without the clause. It gained nothing to itself by working a loss on matured obligations between citizens. All new obligations between individuals, and all transactions betwen citizens and the Government, will be entered into after calculation of the character of the currency in which they may be liquidated. This view of the subject is only important if this act shall be maintained as a war measure.

The Secretary of the Treasury admitted his doubts of the law; but the pressure of the financial necessity determined his course, and a majority of Congress undoubtedly acted from what they supposed was demanded by the exigencies of a great financial crisis.

II.    Our State is sovereign to control her own domestic affairs, and without discussing the question of the validity of these treasury notes, for all ordinary transactions of business, the State has the undoubted right, in dealing with her own citizens, to exact from them such measures of tribute, and in such kind of currency, as may be deemed best for her own interest.

That, for the sake of the argument, admitting these treasury notes, with their legal tender clause, as legal, as valuable as the gold and silver minted coin of the United States, nevertheless our State Legislature has the right to say—" We will exact from our own citizens payment in coin."

If no other motive governed the Legislature than mere caprice, yet the law, which directs the collection of revenue in gold and silver coin, is to be respected and sustained.

The Court will, however, presume a higher motive. Our State owes, in round numbers, $4,000,000; our obligations are held by the citizens of foreign Governments; our coupons are in the hands of other people, who contracted with us while coin was our only mode of payment. Foreigners, and citizens of other States, who, having no part in the creation or countenance of the troubles in which we

are involved, should be required to support none of the burdens of our war.

Every consideration of honor and good faith requires us to pay our foreign bond holders their interest in coin; we must collect in coin to enable us to do so.

The power of taxation is a sovereign power in the State, and must carry with it the right to determine in what currency taxes shall be receivable.

Our State has, on more than one occasion, for certain taxes, determined to receive Controller's warrants.

The Tax Collector is now receiving certain city scrips for delinquent taxes; judgments against the city have been so received.

Gold dust, grain, or any other article of value, might be exacted for taxes.

The citizen owes the obligation to the State to aid in bearing the burdens of State government, and it is for the State, acting through her Legislature, to prescribe the kind and measure of that support.

III.   The Act does not intend to enforce the collection of State taxes in " legal tender notes ;" if so, taxes would have been particularly designated.

The Supreme Court has not decided, in the case of *The People* v. *Seymour*, that taxes are debts due the State, in the sense in which the word debts is used in the Act of Congress.

FIELD, C. J. delivered the opinion of the Court—NORTON, J. and COPE, J. concurring.

This is an application for a *mandamus* to compel the defendant, as Tax Collector of the city and county of San Francisco, to accept from the relator two hundred and seventy dollars and forty-five cents, in " United States notes," tendered in payment of State and county taxes, assessed upon his property for the present year, and to execute and deliver to him a good and sufficient receipt for the taxes.   The " United States notes " were issued pursuant to an Act of Congress, passed the twenty-fifth day of February, 1862, which declares that they " shall be receivable in payment of all taxes, internal duties, excises, debts and demands, of every kind, due to the United States, except duties on imports, and of all

claims and demands against the United States, of every kind what-
soever, except for interest upon bonds and notes, which shall be
paid in coin; and shall also be lawful money, and a legal tender in
payment of all debts, public and private, within the United States,
except duties on imports and interest as aforesaid."

The general Revenue Act of this State, of May 17th, 1861, de-
clares that all taxes for State or county purposes "shall be paid in
the legal coin of the United States, or in foreign coin at the value
fixed for such coin by the laws of the United States;" with a pro-
viso that county taxes levied in accordance with any special Act,
may be collected in such funds as the special Act may designate."
(Sec. 2.)   The Act also declares that every tax levied under its
provisions or authority shall be a lien upon the property assessed,
which shall attach on the first Monday in March of each year, and
shall not be satisfied nor removed until the tax is paid, or the prop-
erty has absolutely vested in a purchaser under a sale for the same
(sec. 3); and that upon the payment of any tax, the collector shall
mark the word "paid," and the date of payment, in the duplicate
assessment roll, opposite the name of the person, or the description
of the property liable for the tax, and shall give to the tax payer a
receipt therefor, specifying the amount of the assessment, the
amount of the tax, and a description of the property assessed.
(Sec. 33.)   As will be perceived, the tax-payer, upon the pay-
ment of his tax, or what is equivalent, a tender of payment, in the
coin designated, is entitled to a receipt from the collector, and it is
the duty of that officer to execute and deliver the same.   It is a
duty which the law specially enjoins upon him, and its performance
may in consequence, under our statute, be enforced by *mandamus.*
(Prac. Act, sec. 467.)   The tax-payer is not obliged to trust to
parol evidence of his payment, which is liable to loss; he is entitled
to a record of the fact on the books of the collector, and to written
evidence of the fact in his own possession.   Such evidence will
show that the lien which follows the property, no matter in whose
hands it may pass, has been removed, and will furnish a ready an-
swer to inquiries generally made as to the payment of the tax, when
a transfer of the property is desired.   If, then, "United States
notes" are receivable for the taxes of the relator, in place of the

legal coin of the United States, or foreign coin at its legalized value, *mandamus* is his appropriate remedy.

The question then presented for determination is this: Are the notes of the United States thus receivable for State and county taxes under the Act of Congress? On the argument, the question whether it is within the constitutional power of Congress to make these notes a legal tender in payment of debts, was ably and elaborately argued by counsel; but from the construction we give to the Act of Congress, this question is not before us. The question is one of great magnitude and importance, upon which the first legal minds of the country differ; and until it is legitimately and directly before us, we have no disposition—nor indeed would it be proper—to express or even intimate an opinion upon it. The Act does not, in our judgment, have any reference to taxes levied under the laws of the State. It only speaks of taxes due to the United States, and distinguishes between them and debts. Its language is, " for all *taxes*, internal duties, excises, *debts* and demands of every kind due to the United States," the notes shall be receivable. When it refers to obligations other than those to the United States, it only uses the term " debts;" the notes it declares shall be " a legal tender in payment of all *debts*, public and private." Taxes are not debts within the meaning of this provision. A debt is a sum of money due by contract, express or implied. A tax is a charge upon persons or property to raise money for public purposes. It is not founded upon contract; it does not establish the relation of debtor and creditor between the taxpayer and State; it does not draw interest; it is not the subject of attachment; and it is not liable to set-off. It owes its existence to the action of the legislative power, and does not depend for its validity or enforcement upon the individual assent of the taxpayer. It operates *in invitum*. If authority for the distinction is required, it will be found in the cases of *The City of Camden* v. *Allen*, (2 Dutcher's New Jersey R. 398); *Pierce* v. *The City of Boston*, (3 Met. 520); and *Shaw* v. *Pickett*, (26 Vt. 482).

The term debt, it is true, is popularly used in a far more comprehensive sense, as embracing not merely money due by contract, but whatever one is bound to render to another, whether from con-

tract or the requirements of the law.   But the legal technical meaning of the term, as used in statutes, and in the Constitution both of the United States and of this State, is as we have defined it.   (Const. U. S., art. 1, secs. 8 and 10 ; art. 6 ; Const. of Cal., art. 8.)   No one would pretend that an act providing for the collection of debts would include, by force merely of the term debts, the collection of taxes also.

The cases of *Moore* v. *Patch*, (12 Cal. 270) and *People* v. *Seymour*, (16 Id. 340) are supposed to hold that a tax is strictly a debt due to the State.   There are expressions in the opinions of the Court which, taken by themselves, disconnected from the facts, give a color to this view; but the real purport and effect of the decisions in those cases is this : that taxes levied under the laws of this State constitute not merely charges upon the property assessed, but personal charges against the taxpayer ; and if from defect of proceedings in the assessment, the property cannot be sold for the payment of the taxes, it is constitutional for the Legislature to legalize the assessment, or to authorize a personal action for their recovery : in other words, that the obligation to pay the taxes is not discharged by a defective assessment of the property. In the latter case, the Court said it was immaterial to consider whether the taxes were " debts in the sense of money obligations` existing by contract.   The Government has the same right to enforce a duty as a debt, and may enforce it in the same way ; the circumstantial difference between the two classes of obligations is nothing, so far as the power of the Government is concerned, between a man voluntarily binding himself to pay money to the Government, and the Government binding him to do so, when he has no option but to obey."   (16 Cal. 344.)

But whatever view may be taken of taxes under our statute— whether in the provisions for their enforcement they can be treated as debts due the State—the question still recurs : What did Congress intend by the act under consideration ?   And upon this question we are clear, that it only intended by the terms " debts, public and private," such obligations for the payment of money as are founded upon contract.

Judgment affirmed.